## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT CHATTANOOGA

| | | |
|---|---|---|
| ISHA PASS | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | Case No. 1:17-cv-315 |
| v. | ) | |
| | ) | Judge Christopher H. Steger |
| NANCY BERRYHILL, Acting | ) | |
| Commissioner of Social Security | ) | |
| | ) | |
| *Defendant.* | ) | |

## MEMORANDUM OPINION

### I.      Introduction

        This action was timely instituted pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of the Commissioner's final decision denying Isha Pass' ("Plaintiff") claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"), as provided by the Social Security Act. Plaintiff seeks benefits primarily on the basis of her mental illnesses: psychotic disorder, bi-polar disorder, depression, anxiety, and a history of schizophrenia/drug use—and also on the basis of her physical impairments: pes planus, obesity, and lumbago. The parties have consented to entry of final judgment by the United States Magistrate Judge under the provisions of 28 U.S.C. § 636(c), with any appeal to the Court of Appeals for the Sixth Circuit [Doc. 19].

        Plaintiff's Motion for Judgment on the Administrative Record [Doc. 24] and Defendant's Motion for Summary Judgment [Doc. 31] are pending. For the reasons stated herein, the Court **REVERSES** the Commissioner's decision and **REMANDS** pursuant to Sentence Four of 42 U.S.C. § 405(g) for an award of benefits. Accordingly, the Court **GRANTS** Plaintiff's Motion [Doc. 24] and **DENIES** Defendant's Motion [Doc. 21].

## II.    Background

### A.    Procedural History

Plaintiff requests a review of the Commissioner's final decision, dated February 4, 2016 [Tr. 407-34], denying her benefits. This case's procedural history is extensive. Plaintiff filed initial applications for disability insurance benefits and supplemental security income on December 7, 2007, which were denied in an Administrative Law Judge ("ALJ") decision dated August 4, 2009 [Tr. 53-60]. This became the final decision of the agency with respect to Plaintiff's December 2007 applications.

Plaintiff filed subsequent applications on March 25, 2010, alleging disability since June 1, 2007, due to bipolar disorder and schizophrenia; she made no claims of physical impairments [Tr. 131-41, 164]. This second set of applications was denied initially [Tr. 61-62, 65-74], and on reconsideration [Tr. 63-64, 80-85]. Plaintiff then requested a hearing before an ALJ [Tr. 86-88]. Prior to the hearing, Plaintiff amended her alleged onset date to August 5, 2009, the day after the August 2009 decision and the earliest date her claims for disability could be considered on her new applications [Tr. 211]. On March 24, 2011, ALJ Richard Gordon heard testimony from Plaintiff and a vocational expert [Tr. 36-49]. In an April 1, 2011 decision, ALJ Gordon found Plaintiff not disabled under the Act and denied her applications [Tr. 23-31]. Plaintiff requested review of the April 2011 decision [Tr. 19], which the Appeals Council denied on June 20, 2012 [Tr. 1-6]. Having exhausted her administrative remedies, Plaintiff timely appealed to the United States District Court for the Eastern District of Tennessee. [*See* Doc. 1, *Pass v. Comm'r of Soc. Sec.*, No. 1:12-cv-267-HSM-WBC (E.D. Tenn. Jan. 23, 2013)].

During the pendency of her appeal to this Court on her second set of applications, Plaintiff, for a third time, filed applications for DIB and SSI on June 28, 2011, amending her alleged onset

date to March 25, 2011 [Tr. 677-89]. Following a hearing held on September 6, 2012, [Tr. 442-53], ALJ John Proctor issued a decision on October 10, 2012, as to her third set of applications finding Plaintiff to be not disabled under the Act and denying her third applications [Tr. 457-67]. Plaintiff requested the Appeals Council review this October 2012 decision to deny her third set of applications [Tr. 556].

Turning back to Plaintiff's appeal to this Court on January 23, 2013, of her second applications, the parties filed a joint motion in this Court seeking remand. The joint motion was filed after Plaintiff filed her motion for summary judgment [Doc. 10, Plaintiff's Motion for Summary Judgment, Case No. 1:12-cv-267]. In her motion, Plaintiff alleged ALJ Gordon erred because he found Plaintiff's mental condition had deteriorated since the decision on her first applications for disability had been entered, yet ALJ Gordon had assigned a less restrictive mental residual functional capacity to Plaintiff than was offered in the prior decision [*Id.* at 5-7]. ALJ Gordon found Plaintiff was capable of occasional contact with the public when the prior ALJ had found she was capable of only rare contact with the public [*Id.*]. This Court granted the parties' Joint Motion for Remand and sent ALJ Gordon's April 2011 decision back to the agency for further development pursuant to Sentence Four of 42 U.S.C. § 405(g) [Tr. 472-73].

On September 27, 2013, the Appeals Council remanded Case No. 1:12-cv-267 (second applications) to a new ALJ, Jeannie Bartlett [Tr. 475-79]. In that same Order, the Appeals Council granted review of the October 2012 decision on Plaintiff's June 2011 (third) applications, consolidated her March 2010 (second) and June 2011 (third) applications, and vacated both the April 2011 decision (second - ALJ Gordon) and October 2012 decision (third - ALJ Proctor) decisions [Tr. 477]. Among other directives, the Appeals Council instructed that the ALJ shall, upon remand,

> Consider obtaining evidence from a medical expert in the field of psychology or psychiatry to assist in determining the extent of the claimant's mental impairments and the effect of these impairments upon her ability to engage in work activity.

[Tr. at 478]. Subsequently, the Commissioner did obtain a psychological assessment of, and an opinion regarding Plaintiff by Kathryn Smith, Ph.D. [Tr. 773-82].

On August 14, 2014, ALJ Bartlett heard testimony from Plaintiff and a vocational expert [Tr. 505]. In a November 7, 2014, decision, ALJ Bartlett found Plaintiff not disabled under the Act and denied her applications [Tr. 505-18]. Plaintiff requested review of ALJ Bartlett's November 2014 decision, [Tr. 603-04], which the Appeals Council granted, and on September 23, 2015, the Appeals Council again remanded the case to ALJ Bartlett for further development [Tr. 525-30]. In the order of remand, the Appeals Council found that, among other things, ALJ Bartlett had not properly evaluated Dr. Kathryn Smith's opinion:

> The hearing decision does not contain an adequate evaluation of the opinions from Kathryn R. Smith, Ph.D., in Exhibits Bl2F and Bl3F. The claimant was psychologically examined on December 23, 2013 (Exhibit Bl2F). Based on this evaluation, Dr. Smith appeared to concur with a prior diagnosis of psychotic disorder, NOS and also noted borderline to low-average intellectual functioning (Exhibit Bl2F, pages 4-5). Dr. Smith indicated that the claimant had moderate to marked limitations in understanding and remembering, sustaining concentration and persistence, and interacting with others; had marked limitations in adapting to changes and requirements; and was incapable of managing personal finances (Exhibit 12F, page 5). In a specific assessment of the claimant's ability to perform mental work-related activities, Dr. Smith noted marked (defined as a substantial loss in the ability to effectively function) restriction in the ability to make judgments even on simple work-related decision; marked restriction in the ability to interact appropriately with the public; and marked restriction in the ability to respond appropriately to usual work situations and to changes in a routine work setting (Exhibit Bl3F, pages 1-2).

> Although the decision gives Dr. Smith's opinion "some" weight (pages 8-9) and indicates the claimant requires isolated work with rare contact with the general public and occasional contact with co-workers and supervisors with no teamwork and limits the claimant to "low stress" work "in terms of production demands and the need to adapt to changes in the workplace or work routine" (Finding 5), the nature of the limitations on production demands or changes in the workplace or work routine are undefined. It is not apparent that Dr. Smith's opinion regarding the

claimant's marked restrictions are consistent with the mental residual functional capacity finding as determined at pages 8 and 9 of the decision. While not entirely clear, the vocational expert appeared to testify that a hypothetical person with [the limitations imposed by Dr. Smith] would be unable to perform any jobs due to marked limitations (Hearing Recording approximately at 10:22:55-10:24:50 AM). Further consideration of Dr. Smith's opinions is warranted.

[Tr. 527-28].

The Appeals Council directed that ALJ Bartlett re-evaluate Dr. Smith's opinion pursuant the applicable regulations and state her reasons for the weight assigned to the opinion; obtain additional medical evidence including, if warranted, a consultative mental-health examination with psychological testing; further consider the claimant's maximum residual functional capacity (RFC) for the entire period at issue, and obtain supplemental evidence from a vocational expert to further clarify the effect of the assessed limitations of the claimant's occupational base [Tr. 528-29]. The Appeals Council also clarified that the period under review begins on August 5, 2009, the alleged onset date in the second set of disability applications [Tr. 529].

On January 6, 2016, upon remand, ALJ Bartlett heard testimony from Plaintiff, a non-examining psychological expert, and a vocational expert [Tr.1753-87]. No subsequent consultative mental-health examination with psychological testing was obtained at this stage. In a February 4, 2016 decision, the ALJ found Plaintiff not disabled under the Act and denied her applications [Tr. 407-34]. This February 2016 decision became the Commissioner's "final decision" subject to judicial review on July 25, 2017, when the Appeals Council declined to assume jurisdiction [Tr. 398-403]. This action followed.

## B. Facts

Born in 1982, Plaintiff was 27 years old on August 5, 2009, and 34 years old when the ALJ issued the February 2016 decision [Tr. 131, 434]. Her level of education is unclear. One Disability Report states she completed 12th grade [Tr. 165], but another Disability Report

indicates that she completed only 8th grade [Tr. at 737]. These Disability Reports are typed and appear to have been filled out by DDS personnel at a field office during an interview with Plaintiff. Plaintiff reported to psychological examiner David Thompson, M.A., that she was in special education and completed only 8th grade [Tr. 772]. Plaintiff has worked as a housekeeper, sorter, and cashier in the 15 years prior to the relevant period; however, she has held none of these positions long enough for them to amount to substantial gainful activity [Tr. 165-66, 433].

Plaintiff alleged that she could not work due primarily to mental impairments but also due to physical impairments. The details of the medical evidence submitted over the seven-year relevant period were catalogued by ALJ Bartlett in pages 4-16 of her 28-page, single-spaced, February 2016 decision [Tr. 410-422], and are incorporated herein. The Court will discuss the evidence as is necessary to address the issues in this case.

After considering the entire record, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

2. The claimant has not engaged in substantial gainful activity since August 5, 2009, the earliest date disability can be considered (20 CFR 404.1571 *et seq.,* and 416.971 *et seq.).*

3. The claimant has the following severe impairments: bipolar disorder; psychotic disorder; depression; history of schizophrenia/drug abuse; anxiety; pes planus; obesity; and lumbago (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except she can have no interaction with the general public and only infrequent interaction with supervisors and peers; her work should be in a well-spaced work environment and involve

primarily things rather than people; the work should be simple, routine, repetitive type work that would involve only infrequent and gradually introduced changes; and there should be no high production quotas involved in the work, meaning work that is not high-paced and dependent on high quotas.

6.   The claimant is capable of performing past relevant work as a housekeeper, medium exertional level, unskilled (SVP-2), <u>Dictionary</u> of <u>Occupational</u> <u>Titles</u> (DOT)# 381.687-018. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.   The claimant has not been under a disability, as defined in the Social Security Act, from August 5, 2009, through the date of this decision (20 CFR 404.1520(1) and 416.920(1)).

[Tr. 410, 422, 424, 429, 432-33, 434].

## III.      Discussion

### A.      Standard of Review

The determination of disability under the Act is an administrative decision. To establish disability under the Social Security Act, a claimant must establish she is unable to engage in any substantial gainful activity due to the existence of a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A); *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). The Commissioner employs a five-step sequential evaluation to determine whether an adult claimant is disabled. 20 C.F.R. §§ 404.1520; 416.920. The following five issues are addressed in order:  (1) if the claimant is engaging in substantial gainful activity she is not disabled; (2) if the claimant does not have a severe impairment she is not disabled; (3) if the claimant's impairment meets or equals a listed impairment she is disabled; (4) if the claimant is capable of returning to work she has done in the past she is not disabled; (5) if the claimant can do other work that exists in significant numbers in the regional or the national economy she is not

disabled. *Id.* If the ALJ makes a dispositive finding at any step, the inquiry ends without proceeding to the next step. 20 C.F.R. §§ 404.1520; 416.920; *Skinner v. Sec'y of Health & Human Servs.*, 902 F.2d 447, 449-50 (6th Cir. 1990). Once, however, the claimant makes a *prima facie* case that she cannot return to her former occupation, the burden shifts to the Commissioner to show that there is work in the national economy which she can perform considering her age, education and work experience. *Richardson v. Sec'y of Health and Human Servs.*, 735 F.2d 962, 964 (6th Cir. 1984); *Noe v. Weinberger*, 512 F.2d 588, 595 (6th Cir. 1975).

The standard of judicial review by this Court is whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner made any legal errors in the process of reaching the decision. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971) (adopting and defining substantial evidence standard in the context of Social Security cases); *Landsaw v. Sec'y of Health and Human Servs.*, 803 F.2d 211, 213 (6th Cir. 1986). Even if there is evidence on the other side, if there is evidence to support the Commissioner's findings they must be affirmed. *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The Court may not reweigh the evidence and substitute its own judgment for that of the Commissioner merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard allows considerable latitude to administrative decision makers. It presupposes there is a zone of choice within which the decision makers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027 (6th Cir. 1994) (citing *Mullen v. Bowen*, 800 F.2d 535, 548 (6th Cir. 1986)); *Crisp v. Sec'y, Health and Human Servs.*, 790 F.2d 450 n.4 (6th Cir. 1986).

The court may consider any evidence in the record, regardless of whether the ALJ cited it. *See Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). However, for purposes

of substantial evidence review, the court may not consider any evidence that was not before the ALJ. *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Furthermore, the court is not obligated to scour the record for errors not identified by the claimant, *Howington v. Astrue*, No. 2:08-cv-189, 2009 WL 2579620, at *6 (E.D. Tenn. Aug. 18, 2009) (stating that assignments of error not made by claimant were waived), and "issues which are 'adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived,'" *Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) (quoting *United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996)).

**B.      Analysis**

Plaintiff raises a number of issues, but the Court finds that two issues predominate—and the first issue is ultimately dispositive in this case:  (1) whether the ALJ's decision to give more weight to the DDS psychological consultant, Dr. Calvin Vanderplate, instead of DDS psychological consultants, David Thompson, M.A. and Dr. Kathryn Smith, is supported by substantial evidence; and (2) whether the ALJ's determination that Plaintiff can perform a full range of medium level work is support by substantial evidence. The Court will address each issue in turn.

**1.      The Opinion of Kathryn R. Smith, Ph.D.**

**a)      Weight Given to Dr. Smith's Opinion**

In January 2014, the Commissioner selected David M. Thompson M.A, Licensed Senior Psychological Examiner, and Kathryn R. Smith, Ph.D., Licensed Clinical Psychologist to assess Plaintiff and provide an opinion regarding her mental limitations. To this end, Plaintiff was interviewed on December 23, 2013 [Tr. 773-82].

Plaintiff presented at the interview as anxious, guarded, and withdrawn [Tr. 773]. She stared vacantly and demonstrated little or no emotion [*Id.*]. Responses were vague indicating poor long-term memory [*Id.*]. She reported attending school through the eighth grade in special education [*Id.*]. She stated she could only add and subtract, not multiply and divide. She was living in "supported housing" with her son [*Id.*]. She reported ongoing auditory hallucinations and visual hallucinations of spiders [*Id.*]. She stated she hears voices that tell her to kill herself and say, "you are not right and you are good for nothing." [*Id.*]. She also stated sometimes she is mad but doesn't know why [Tr. 774]. She was able to recall only one of three unassociated stimulus words after a five-minute interval [*Id.*]. She could not complete serial subtraction of 7's or 3's or count backwards from 20 to 1 [*Id.*]. She identified the colors of the American flag as gray, blue, and black [*Id.*]. She could not identify the first president though she knew the current president was Barack Obama; she identified Martin Luther King, Jr., as the person who "freed us from being slaves." [*Id.*]. She was unaware of any current events. Her intellectual functioning was estimated to be in the low-average to borderline ranges [*Id.*]. Dr. Smith opined Plaintiff had "limited insight and judgment." [*Id.*]. She reported her mother tells her when to bathe and what clothes to wear [Tr. 775]. The examiner found her ability to manage her income, $347 in food stamps, to be "questionable at best." [*Id.*]. She reported she stays away from people because she might hurt them if they do something [*Id.*]. Her mother or sister takes her shopping and regularly comes to her home to help with food preparation and cleaning [*Id.*]. She was "minimally alert and orientation [was] poor for place." She reported "nothing of ongoing interest," just "sitting at home and smoking my cigarettes." [*Id.*]. Plaintiff reports she began having mental health-related symptoms after her son was born seven years ago [Tr. 775]. She stated she tried to kill her mother and her baby's father in the past because she was hearing voices [Tr. 775]. She stated she stays away from people because

"they might do something and I might kill 'em." [*Id.*]. She reports she occasionally does light housekeeping and cooking. She has not driven in some time and doing laundry is difficult [Id.]. Her mother and sister regularly visit her home to help with food preparation and cleaning [Id.]. She "was generally cooperative with the interview." [Tr. 722]. The only records provided Dr. Smith were from Volunteer Health Care System for January 2006 to August 2006. On the basis of this interview and the records, Dr. Smith noted a diagnosis of Psychotic Disorder NOS [*Id.*].

Dr. Smith made the following assessments:

| | |
|---|---|
| Understanding and Remembering | Moderate to marked limitation |
| Sustaining Concentration and Persistence | Moderate to marked limitation |
| Interacting with Others | Moderate to marked limitation |
| Adapting to Changes and Requirements | Marked limitation |

[Tr. 776]. In the Medical Source Statement of Ability To Do Work-Related Activities (Mental), Dr. Smith made the following, additional assessments regarding the degree of limitations as to Plaintiff's abilities:

| | |
|---|---|
| Understand and remember simple instructions | Moderate limitation |
| Carry out simple instructions | Moderate limitation |
| Understand and remember complex instructions | Marked limitation |
| The ability to make judgments on simple work-related decisions | Marked limitation |
| Understand and remember complex instructions | Marked limitation |
| Carry out complex instructions | Marked limitation |
| The ability to make judgments on complex work-related decisions | Marked limitation |
| Interact appropriately with the public | Marked limitation |
| Interact appropriately with supervisors | Moderate limitation |
| Interact appropriately with co-workers | Moderate limitation |

| Respond appropriately to usual work situations and to changes in a routine work setting | Marked limitation |

[Tr. 779-80]. Dr. Smith also found Plaintiff incapable of managing her own finances independently [Tr. 776].

As previously indicated, ALJ Bartlett subsequently denied Plaintiff's claim, but the Appeals Council remanded Plaintiff's claim a second time to ALJ Bartlett, in part, for a re-evaluation of Dr. Smith's opinion. Upon this second remand, ALJ Bartlett held a hearing on January 6, 2016, in which Calvin Vanderplate, Ph.D., ABPP, testified.

Dr. Vanderplate testified he considered Dr. Smith's opinion "invalid due to malingering on that test." [Tr. 1770]. Dr. Vanderplate concluded Plaintiff was malingering, and he expressed the opinion that visual hallucinations are extremely rare and frequently associated with drug withdrawal, an organic condition, or traumatic brain injury. Dr. Vanderplate then flatly stated that visual hallucinations are "not a bona fide psychotic symptom." [Tr. 1771-72]. He also found—as evidence of malingering—her inability to count backwards from 20 to 1, "to do Serial 3's or serial 7's, her inability to spell the word "world," or her inability to correctly list the colors of the American flag [Tr. 1772].

Reviewing her records, Dr. Vanderplate made the following findings regarding Plaintiff:

- Plaintiff had had no anxiety from 2013 to the date of the hearing and no evidence of significant psychological symptoms from 2014 to 2015 [Tr. 1760-70].

- Plaintiff would be capable of at least simple and detailed tasks, attending and completing for at least two hours at a time in an eight-hour day, and could complete a 40-hour week [Tr. 1771].

- Plaintiff had only moderate limitations in dealing with the public [*Id.*].

- Plaintiff was capable of only infrequent contact with the public [*Id.*].

- Plaintiff had no limitations with supervisors and co-workers [*Id.*].

- Plaintiff had no limitations in adaptive ability to work situations [*Id.*].

The ALJ gave Dr. Vanderplate's testimony "generally great weight." [Tr. 424]. Based on Dr. Vanderplate's testimony, the ALJ found visual hallucinations were "contraindicative of schizophrenia." [Tr. 424]. The ALJ further found Plaintiff's hallucinations had been improved by medicine [*Id.*]. The ALJ did not find Plaintiff's reported symptoms and limitations to be credible based on Dr. Vanderplate's opinion that Plaintiff was malingering and based on the ALJ's assessment of her treatment records [*Id.*].

The ALJ gave "significant weight" to Dr. Smith's assessment that Plaintiff has a moderate impairment in her ability to interact with her co-workers and supervisors and a marked limitation in her ability to interact with the general public [Tr. 423]. The ALJ gave "little weight" to Dr. Smith's assessment that Plaintiff has marked limitations in the ability "to make judgments on simple work-related decisions" and "to respond appropriately to usual work situations and to changes in routine work setting." [Tr. 424]. The ALJ's stated reason for this weight was

> primarily due to Dr. Vanderplate's testimony. He noted Dr. Smith gave a marked limitation in adaptation to stress and decompensation, but after reviewing the entirety of the medical evidence, Dr. Vanderplate found no indications of any decompensation under stress or documented hospitalizations for mental health issues, factors inconsistent with a marked limitation.

[Tr. 424]. The ALJ did not, however, adopt Dr. Vanderplate's opinion that Plaintiff had no limitations in work adaptability; rather, she found Plaintiff had moderate—as opposed to Dr. Smith's marked—limitations in adaptability to the workplace [Tr. 425-26].

Dr. Vanderplate also rejected the medical statement of psychological consultant Jeffery Eckert, Psy.D., L.C.S.W. Dr. Eckert completed his evaluation on the basis of the record as of March 16, 2011 [Tr. 332-41]. Dr. Eckert found Plaintiff to have marked limitations in fifteen categories including the ability to understand, remember, and carry out simple instructions; to

maintain regular attendance; to make simple work-related decisions; and to interact with the public, co-workers, and supervisors. Dr. Eckert also found Plaintiff extremely impaired in her ability to appropriately respond to changes in the work setting [Tr. 334-35]. Dr. Vanderplate opined these limitations were inconsistent with the record [Tr. 1775]. The ALJ agreed with Dr. Vanderplate and gave Dr. Eckert's opinion little weight [Tr. 426].

Finally, the ALJ relied upon the DDS non-examining consultative opinion by George T. Davis, Ph.D., dated May 7, 2010. Dr. Davis opined Plaintiff was mildly limited in activities of daily living; moderately limited in maintaining social functioning; moderately limited in maintaining concentration, persistence and pace; and had had no episodes of decompensation of an extended duration [Tr. 275]. On the Mental Residual Capacity Assessment, Dr. Davis found moderate limitations in ability to maintain persistence and pace; to complete a normal workweek without interruptions; to interact appropriately with the public, co-workers, and supervisors; and to adapt to changes in the workplace [Tr. 279-80]. He found no marked limitations [*Id.*].

Plaintiff asserts that the ALJ's decision to give greater weight to Dr. Vanderplate's opinion than to Dr. Smith's opinion is not supported by substantial evidence. More specifically, the Plaintiff argues that it was error for the ALJ to adopt Dr. Vanderplate's opinion regarding Plaintiff's limitations in the ability "to make judgments on simple work-related decisions" and "to respond appropriately to usual work situations and to changes in routine work setting." The Court agrees with Plaintiff for the reasons set forth below.

First, the Court has several concerns with Dr. Vanderplate's testimony. Dr. Vanderplate's opinion that Plaintiff was malingering during her assessment is based in significant part on an incorrect assumption regarding visual hallucinations. Dr. Vanderplate opined Plaintiff was malingering because Plaintiff reported visual hallucinations in addition to auditory hallucinations.

Dr. Vanderplate stated visual hallucinations were not "bona fide" symptoms of a psychotic disorder. This testimony prompted ALJ Bartlett to find that visual hallucinations are "contraindicative" of a schizophrenic disorder [Tr. 424]. These assertions are directly contradicted by the *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. American Psychiatric Association 2013) (DSM-V). The DSM-V states that hallucinations are symptoms of mental illnesses in the Schizophrenia spectrum which includes psychotic disorders. See DSM-V at 87. Since 2006, Plaintiff has consistently been diagnosed by various mental health providers as having a psychotic disorder. While the DSM-V notes that most hallucinations are auditory, it explicitly states "[t]hey [hallucinations] may occur in *any sensory modality*. . . ." *Id.* (emphasis added).[1] Further, studies have shown that such symptoms have been reported by some 16% to as many as 72% of patients with schizophrenia and schizoaffective disorder.[2] Dr. Vanderplate's opinion—and ALJ Bartlett's reliance on that opinion—concluding that visual hallucinations are not genuine symptoms of a psychotic disorder are inconsistent with the psychiatric profession's primary diagnostic manual. Thus, their finding that the hallucinations reflect malingering appears to be unsubstantiated.

Dr. Vanderplate also cited—as evidence of malingering—Plaintiff's inability to count backwards from 20 to 1, "to do Serial 3's or serial 7's," her inability to spell the word "world," and her inability to correctly identify the colors of the American flag. However, Dr. Vanderplate did

---

[1] The Sixth Circuit Court of Appeals has noted the *Diagnostic and Statistical Manual of Disorders* (DSM) is referred to as the "psychiatric profession's diagnostic Bible . . . "; *Lundgren v. Mitchell*, 440 F.3d 754, 789 (6th Cir. 2006); *see also, e.g., Lee v. Barnhart*, 117 F. App'x 674, 678 (10th Cir. 2004) (DSM is the "diagnostic Bible of mental disorders"); *Cdebaca v. Colvin*, No. 15-cv-02040, 2016 WL 6212522, at *5 (D. Colo. Oct. 17, 2016 (same); *United States v. Bennett*, 29 F. Supp.2d 236, 238 n. 5 (E.D. Penn. 1997) (DSM is the "so called 'Bible' of the [psychiatric] profession.")

[2] *See* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2660156/ (last visited 2/21/2019); *see also* https://academic.oup.com/schizophreniabulletin/article/40/Suppl_4/S233/1875426 (last visited 2/21/19) ("VHs [visual hallucinations] are linked to a more severe psychological profile and less favorable outcome in psychosis. . . .")

not refer to any specific portion of the record to support his assertion that Plaintiff should be able to accomplish these tasks. His assessment of her math, spelling, and general knowledge abilities are unsupported by reference to the record and seem to simply reflect Dr. Vanderplate's belief. Dr. Vanderplate's unsubstantiated opinion does not constitute substantial evidence to discredit Dr. Smith's opinion.

In point of fact, the record supports Dr. Smith's findings concerning Plaintiff's cognitive limitations. In a Function Report dated July 8, 2011, Plaintiff spelled "clothes" as "clots" [Tr. 729], "frozen" as "forzen" [Tr. 730], "smoking" as "smokeing" [Tr. 731], "said" as "sade" [Tr. 731], "weight" as "weigth" [Tr. 731], and "friends" as "frends" [Tr. 732]. Plaintiff's education level is unclear—at least one report indicates she completed the eighth grade in special education. And as will be noted, while the record indicates Plaintiff took GED classes at some point, it also indicates she did not successfully complete those classes.

Second, the Court also finds unsupported by substantial evidence the conclusion reached by Dr. Vanderplate and the ALJ that Dr. Smith's opinion is unsupported by Plaintiff's treatment records. Dr. Vanderplate's statement that Plaintiff did not suffer significant psychological symptoms from 2014 to 2015 is not supported by the record, as will be discussed.

In examining the treatment records and the ALJ's decision, it appears that Dr. Vanderplate's incorrect assessment of Plaintiff's visual hallucinations influenced his assessment of Plaintiff's symptoms in their entirety. Dr. Vanderplate—and by extension, the ALJ—discounted the severity and frequency of *all* Plaintiff's psychotic symptoms. That finding, however, is at odds with other record evidence. There are no indications from any of Plaintiff's mental health providers that she fabricated reports of visual or auditory hallucinations or paranoia. All of her providers took her reports seriously, and she was consistently prescribed anti-psychotic medications for her condition.

Due to various side-effects or ineffectiveness, her anti-psychotic mediations had to be changed at times. Beyond that, Plaintiff herself asked for these medications to be administered by injection because she had difficulty remembering to take them and because the injections were more effective than oral medications in treating her symptoms. Rather than evidence of willful noncompliance—as the ALJ seems to suggest—Plaintiff's request for injections reflects her desire to follow her doctor's treatment plan. Further, Dr. Vanderplate testified that injections of anti-psychotic medications typically indicate a more severe level of symptoms [Tr. 1773].

In reviewing the ALJ's own recitation of Plaintiff's mental health treatment, it is clear that Plaintiff has had consistent and significant mental health issues for many years, including visual and auditory hallucinations, and paranoia. The record reflects that Plaintiff has a type of impairment which is remitting and relapsing in nature. In such a situation, focusing solely on periods of remission as evidence of ability to work is inappropriate. The totality of the claimant's condition should be factored into her ability to engage in substantial gainful activity. *Gentry v. Comm'r of Social Sec.,* 741 F.3d 708, 723 (6th Cir. 2014).

The record in this case is extensive. Having incorporated the ALJ's factual recitation of Plaintiff's treatment in this opinion, the Court will focus on treatment from March 2013 to the date of the ALJ's opinion—a time period which covers the 2014 to 2015 period during which Dr. Vanderplate stated Plaintiff did not have significant psychological symptoms.

From March 2013 to December 2015, the Court counted at least sixty-four visits to a mental health provider or case manager for mental health reasons. In March 2013, Plaintiff reported her anti-psychotic medications were working and she was doing alright [Tr. 1385, 1383, 1381]. But by April 22, 2013, she reported feeling paranoid. She believed people were following her, and she wanted to fight. Her medications were making her nauseous and she was going to contact the nurse

[Tr. 1159, 1374]. In May 2013, she reported her medications were not working as well as they had been previously, but she was taking them as required [Tr. 1375]. She still thought someone was following her [Tr. 1145]. In June 2013, her mother accompanied her for her injections of anti-psychotic medication. Plaintiff's affect was flat, and she exhibited little eye contact [Tr. 1145, 1152]. In July 2013, she was having difficulty remembering to take her medications as prescribed. She was sad and depressed, and her mother was tearful [Tr. 1369]. By the end of July 2013, she reported being less paranoid but was still hearing voices. She was switching to an injection of Risperdal [Tr. 1317-1321]. In August 2013, she reported doing much better, but was still hearing voices though they were diminished. She was still suspicious of others at times and wondered about their intentions toward her [Tr. 1310]. In September 2013, she reported Risperdal injections were effective in eliminating auditory hallucinations, but she still had rare visual hallucinations. Paranoia was significantly improved. Her mother reported, "Isha need [sic] some more medicine for anger." [Tr. 1124]. In October and most of November 2013, she reported doing well on her medications with no side effects. However, on November 25, 2013, she reported "voices are bothering me all the time," though her paranoia was better [Tr. 1296]. The clinician reported Plaintiff's "psychotic symptoms are significantly distressing to her." [Tr. 1299]. In December 2013, Plaintiff reported increased paranoia. She felt her family was trying to hurt her—that they didn't feed her son and said bad things about her. Voices were telling her she is "good for nothing." At night, she saw spiders and heard more voices [Tr. 1030]. She was sad, isolating herself, and rarely going outside [Tr. 1032]. Plaintiff reported Risperdal was helping with psychotic symptoms, but she hears more voices when she is depressed. She also reported she sometimes has thoughts about harming others when they aggravate her, but she has no intention of actually harming anyone [Tr.

1110]. In late December 2013, Plaintiff went to a walk-in mental health clinic reporting hearing voices and seeing spiders. She stated Risperdal was not working [Tr. 1289].

On January 9, 2014, Plaintiff told her case manager something is wrong with her because she feels like the devil, and she thinks evil thoughts of hurting people's feelings the way they hurt hers. Prozac was helping with her depression [Tr. 1028]. On January 29, 2014, and in February of 2014, she reported that her medications were working well and the Risperdal injection had eliminated the voices [Tr. 1349, 1347, 1345]. In February 2014, she elected to discontinue taking GED classes because she was feeling overwhelmed [Tr. 1347]. The next month, in March 2014, she was seeing spiders and hearing negative voices several days out of the week. She asked for a stronger injection of anti-psychotic medicine [Tr. 1342, 1343, 1274]. On April 11, 2014 and April 30, 2014, Plaintiff reported her medications were working, and she was having no hallucinations, but on April 13, 2014, she reported she was experiencing visual hallucinations [Tr. 1088, 1339, 1337]. In May and June 2014, Plaintiff's visual hallucinations were intermittent [Tr. 1335, 1333, 1331, 1329, 1327, 1260]. Plaintiff reported she would start GED classes again at the end of the month [Tr. 1327]. Her medications were working well on July 10, 2014, but she reported on July 21, 2014, that she was experiencing hallucinations [Tr. 1375, 1416-17]. She reported going to see her son's football practice with her fiancée [Tr. 1416-17]. On August 5, 2014, she reported increased anxiety but emphatically denied hallucinations [Tr. 1610]. She reported no hallucinations on August 8, 2014, but by August 27, 2014, her hallucinations were coming and going and she was hearing voices [Tr. 1413-14]. Her relationships were "rocky" and she decided not to pursue a GED at that time [Tr. 1413]. In September 2014, she was having visual and auditory hallucinations three to four times a week despite taking her medications as prescribed [Tr. 1408-10, 1599]. The clinician reported Plaintiff finds the hallucinations are "significantly distressing."

[Tr. 1599]. From October 2014 to May 2015, she did not report hallucinations though she had some generalized paranoia and worried a lot [Tr. 1592, 1419, 1580, 1574]. On May 8, 2015, she told her provider that she wanted to stop taking the injections because she wanted to have a baby [Tr. 1568]. She returned on June 9, 2015, and reported that she needed to go back to the injections because she could not bear the symptoms of paranoia and auditory hallucinations. She also decided not to get pregnant [Tr. 1561]. On June 6, 2015, Plaintiff went to the Volunteer Behavioral Health walk-in clinic for a face-to-face crisis assessment. Her Invega injection was making her light-headed and foggy [Tr. 1432]. She reported visual and auditory hallucinations though she was not having them at that moment [Tr. 1432]. She was adequately groomed, her speech was slow, her thought process was linear, and she exhibited fair insight and judgment [Tr. 1427-28]. On July 14, 2015, she reported that her paranoia, depression, and anxiety had increased, and she did not want to become pregnant because she could not manage without her medication. She wanted to return to the Risperdal injections [Tr. 1555]. In August, September, and December 2015, she indicated she was doing well and denied hallucinations [Tr. 1551, 1543, 1527].

The records indicate Plaintiff received an injection of Risperdal one to two times per month from August 2014 to December 2015 [Tr. 1505-27]. While doctors who initially diagnosed the Plaintiff in the 2000's as having psychotic symptoms suggested her psychosis may be cannabis related, the more recent records indicate Plaintiff has not been using drugs or alcohol, and her psychotic symptoms were not drug or alcohol induced. (*See e.g.,* Tr. 1159, 1149, 1310, 1128, 1610, 1603].

As previously indicated, these records do not support Dr. Vanderplate's and the ALJ's finding that Plaintiff suffered no significant psychological symptoms in 2014 and 2015. Nor do they support Dr. Vanderplate's or the ALJ's assessment that Plaintiff did not show decompensation

of her mental condition during this time period. Both Dr. Vanderplate and the ALJ focused on the fact that Plaintiff had not been hospitalized as evidence that she had suffered no episodes of decompensation [Tr. 424-25]. However, decompensation can be demonstrated by means other than hospitalizations:

> Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace. Episodes of decompensation may be demonstrated by an exacerbation in symptoms or signs that would ordinarily require increased treatment or a less stressful situation (or a combination of the two). Episodes of decompensation may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations, placement in a halfway house, or a highly structured and directing household); or other relevant information in the record about the existence, severity, and duration of the episode.

20 C.F.R. Pt. 404, Subpt. P., app. 1, § 12.00(C)(4) (effective Aug. 12, 2015 to May 23, 2016). Plaintiff's episodes of hallucinations despite medication, her changes in medication (from Invega to Risperdal), and the switch from oral medications to injections are evidence of decompensation in her condition. The Court also finds Plaintiff's work history evinces a decompensation of her condition. Plaintiff has not been able to keep a job. From 2011 to 2015, she, at various times, has worked for The Sports Barn; Dollar Tree Stores; Hospital Housekeeping Systems, LLC; the YMCA of Metropolitan Chattanooga, and RBCB, Inc [Tr. 698-710]. Her earnings have not amounted to substantial gainful activity since August 2009 [Tr. 410]. Plaintiff testified at the January 2016, hearing that "I can't keep a job. I have tried." [Tr. 1763]. She explained she is fired because "I always been done something, cuss somebody out." [Tr. 1763]. In addition, at the time of the hearing, she lived in an apartment next door to her mother who helps her with her household chores [Tr. 1762]. She indicated that her mother chooses her clothes for her and that her mother

and sister assist with shopping, cooking, and cleaning. Thus, her living situation evinces a need for daily support in basic activities. All these factors are indications of decompensation.

As to the countervailing opinion of Dr. George Davis, the DDS non-examining consultant, the Court notes his opinion was given in May 2010. Consequently, he did not have the benefit of additional medical records, nor did he interview or examine Plaintiff. For that reason, I find that Dr. Davis' opinion does not provide substantial evidence for the ALJ's rejection of Dr. Smith's opinion that Plaintiff has marked limitations in the ability to make judgments on simple work-related decisions and to respond appropriately to usual work situations and to changes in routine work setting.

For all the reasons stated above, the Court finds the ALJ's decision not to give great weight to Dr. Smith's opinion—in its entirety—is not supported by substantial evidence.

### b)    Application of Dr. Smith's Opinion

At the January 6, 2016 hearing, the ALJ asked Vocational Expert Benjamin Johnston a hypothetical question which incorporated Dr. Smith's assessments. These assessments included including a marked limitation in the ability to make judgments on simple, work-related decisions and in the ability to respond appropriately to usual work situations and changes in routine. The ALJ asked Dr. Johnson if he would be able to identify any work in the national economy which Plaintiff could perform if Plaintiff had the following RFC:

She was limited physically to medium work with marked limitations in:

- the ability to make judgments on simple, work-related decisions;
- the ability to respond appropriately to usual work situations and changes in routine;
- the ability to understand and remember complex instructions;
- the ability to carry out complex instructions;
- the ability to make judgments on complex instructions; and
- the ability to interact appropriately with the public;

[Tr. 1784]. The Vocational Expert testified that, with these limitations, there would be no work existing in the national economy that a person could perform [*Id.*]. As previously discussed, the Court has concluded that the ALJ's decision not to give Dr. Smith's opinion great weight was not supported by substantial evidence. Applying Dr. Smith's opinion—which is overwhelmingly supported by the record in this case—it was the opinion of the vocational expert, that there are no jobs Plaintiff can perform.

Plaintiff's claims have been remanded three times for a proper review of her claims. Plaintiff argues that, rather than remanding for further review, this claim should now be remanded for an award of benefits . "A judicial award of benefits is proper only where proof of disability is overwhelming or where proof of disability is strong and evidence to the contrary is lacking." *Faucher v. Sec'y Health and Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994); *see also*, *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929, 935 (6th Cir. 2018). In this case, for the reasons discussed, the Court finds proof of disability is overwhelming as of March 25, 2011—which represents Plaintiff's amended, alleged onset date in her third set of applications for disability insurance benefits and supplemental security income which she filed on June 28, 2011. Consequently, the Court will order remand for an award of benefits as of March 25, 2011.

### 2.    Plaintiff's Physical Residual Functional Capacity

If the Court had not determined that Plaintiff was entitled to an award of benefits, it would, nevertheless, remand Plaintiff's claim for a proper assessment of her physical RFC. Plaintiff argues that the ALJ's determination of her physical residual functional capacity is not supported by substantial evidence. Plaintiff elaborates that ALJ Bartlett found her to have the same physical RFC—*with* severe physical impairments—as did the prior ALJ in his 2009 decision—*without* severe physical impairments. In her February 4, 2016, decision, ALJ Bartlett found Plaintiff had

severe physical impairments of pes planus, obesity, and lumbago [Tr. 410], and she determined that Plaintiff was capable of a full range of medium-level work [Tr. 429]. In 2009, there were no findings of a physical impairment, and that ALJ also concluded that Plaintiff was capable of a full range of medium-level work [Tr. 57].

Non-severe impairments are defined as "[a]n impairment or combination of impairments . . . [that] does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. § 1520(a). Basic work activities include, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling. 20 C.F.R. § 1520(b) (1).

Conversely, a severe impairment is one that significantly limits your physical or mental ability to do basic work activities. *See* 20 C.F.R. 404.1520(c) ("If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled.") The severe impairment also must meet the duration requirement: "Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months. We call this the duration requirement." 20 CFR § 404.1509, *see also* 20 CFR § 404.1520(a)(4)(ii) (at second step of disability analysis, the Commissioner will determine whether claimant has a severe impairment which meets the duration requirement of § 404.1509).

In the instant case, ALJ Bartlett found Plaintiff had severe impairments of pes planus, lumbago, and obesity—*i.e.,* impairments which, by definition of "severe impairment," significantly limit Plaintiff's ability to engage in basic work activities. Even so, the ALJ, in effect, concluded these conditions did not affect her ability to engage in basic work activities by giving Plaintiff the same physical RFC that she received in 2009 when she had no severe physical

impairments. Having found that Plaintiff has physical impairments that significantly limit her physical ability to engage in basic work activities, the ALJ cannot then decide that these impairments, in fact, have no effect on Plaintiff's physical ability to engage in basic work activities. The two findings are internally inconsistent. Thus the Court concludes that the ALJ's determination that Plaintiff can engage in a full range of medium work is not supported by substantial evidence.

The Commissioner argues that, under *Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929 (6th Cir. 2018), the ALJ properly gave *all* the evidence a "fresh look" which justifies the ALJ's decision to give Plaintiff the same physical RFC in 2016 that the ALJ gave the Plaintiff in 2009—even though Plaintiff had severe physical impairments in 2016 and not in 2009. The Court disagrees with the Commissioner's interpretation of *Earley*—which is a clarification of the Sixth Circuit's decision in *Drummond v. Comm'r of Soc. Sec*., 126 F.3d 837 (6th Cir. 1997). In *Drummond*, the Sixth Circuit held that an ALJ—guided by principles of res judicata—is bound by the RFC level determined in a previous claim for the same claimant absent new and material evidence indicating a change in the claimant's condition. 126 F.3d 837. The *Early* Court addressed the question of whether these principles of res judicata applied only when they favored the claimant or whether they also applied when they favored the government. In addressing this question, the *Earley* Court began with a detailed discussion of its prior decision.

In *Drummond,* the ALJ originally found that a forty-nine-year old claimant who was limited to sedentary work was not disabled. *Earley*, 893 F.3d at 932. After the *Drummond* claimant turned fifty years old—which was the only change in her circumstances—she filed a second application for a new period. Under the applicable regulations, given her increased age with no other changes in her circumstances, she should have been deemed disabled. *Id.* However, "the second administrative law judge switched gears and found that she could carry out 'medium,' not

just sedentary work, thus making her ineligible for benefits on this new ground." *Id.* (citing

*Drummond*, 126 F.3d at 838-39). The *Earley* Court explained why the *Drummond* Court reversed:

> That was too much for our court to accept. "When the Commissioner has made a final decision concerning a claimant's entitlement to benefits," we said, "the Commissioner is bound by this determination absent changed circumstances." *Id.* at 842. Nothing had changed between the end of the first application and the beginning of the second one—other than the advancement of one year in the applicant's age. In that setting, we explained, "principles of res judicata" prevented the ALJ from revisiting the applicant's capacity to handle anything more than sedentary work in the absence of "new and additional evidence" showing a change in her condition. *Id.*

*Earley*, 893 F.3d at 932–33.

In *Earley*, the claimant had applied twice for disability benefits as did the claimant in

*Drummond*. In the first decision, the ALJ found Earley was not disabled. She applied again for a

new period of disability, and the ALJ concluded, pursuant to *Drummond*, that he was required to

give the claimant the same RFC given in the previous decision absent "new and material evidence

documenting a significant change in the claimant's condition." *Earley*, 893 F.3d at 930. "The

district court reversed, on the ground that the 'principles of res judicata' announced in *Drummond*

apply only when they favor an individual applicant, not the government." *Id.* The *Earley* Court

rejected the district court's approach to *Drummond* and laid out its previous holding succinctly

stating:

> That was wrong. The key principles protected by *Drummond*—consistency between proceedings and finality with respect to resolved applications—apply to individuals *and* the government. At the same time, they do not prevent the agency from giving a fresh look to a new application containing new evidence or satisfying a new regulatory threshold that covers a new period of alleged disability while being mindful of past rulings and the record in prior proceedings.

*Id.* at 930-31.

Thus, had Plaintiff in this case introduced no new evidence documenting a significant

change in her physical condition, her physical RFC should have been limited to a full range of

medium work under *Drummond*. But, Plaintiff did show—and the ALJ found—that her physical circumstances had changed *for the worse*. Pursuant to the principle of "consistency between proceedings," the *starting* point for evaluating Plaintiff's RFC should have been a full range of medium work. Logic and precedent require that a "fresh look" at the physical RFC of Plaintiff—based on her worsened circumstances which, by definition, significantly limit her ability to engage in basic work activities—would result in a physical RFC with *more* limitation, not less than or the same as the original physical RFC. The Government argues that that the "fresh look" approach espoused in *Earley* means that the ALJ could disregard the previous findings of the ALJ in the 2009 opinion; however, that argument means that *Earley* overturned *Drummond*. That is not the case—nor could it be. An en banc review is required for one panel to overturn the decision of a previous panel. *Salami v. Sec'y of Health and Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985).[3]

The Court concludes that the ALJ's physical RFC for Plaintiff is not supported by substantial evidence. Were the Court not already remanding for an award of benefits, it would remand to the Commissioner for an appropriate reassessment of the Plaintiff's physical RFC.

## IV.        Conclusion

For the reasons stated in this opinion, the Court concludes that the Commissioner's decision is not supported by substantial evidence and that the evidence overwhelmingly supports a finding that Plaintiff became disabled as of March 25, 2011, and is therefore entitled to benefits under the Social Security Act pursuant to her applications for DIB and SSI. Accordingly, the decision of the Commissioner is **REVERSED**, and this action is **REMANDED** to the Commissioner under Sentence Four of 42 U.S.C. § 405(g) for an **AWARD** of benefits as of March 25, 2011.

---

[3] Once exception to this rule occurs when the United Supreme Court has issued a decision inconsistent with the previous Sixth Circuit panel decision. *Salami*, 774 F.2d at 689. This exception does not apply here.

**IT IS SO ORDERED.**

/s/ *Christopher H. Steger*
UNITED STATES MAGISTRATE JUDGE